IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: ) <br> ) <br> CATHOLIC DIOCESE OF ) Bank. No. 09-13560 (CSS) <br> WILMINGTON, INC., ) (Chapter 11) <br> ) <br> Debtor. ) | |

| | |
|---|---|
| KENNETH MARTIN, ) <br> ) <br> Appellant, ) <br> ) <br> v. ) Civ. No. 11-814-SLR <br> ) <br> CATHOLIC DIOCESE OF ) <br> WILMINGTON, INC., ) <br> ) <br> Appellee. ) | |

Ronald J. Drescher, Esquire of Drescher & Associates, P.A., Baltimore, Maryland. Counsel for Appellant Kenneth Martin.

Robert S. Brady, Esquire, Anthony G. Flynn, Esquire, and Patrick A. Jackson, Esquire, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Appellee, Catholic Diocese of Wilmington, Inc.

**MEMORANDUM OPINION**

Dated: December 18, 2012
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Before the court is an appeal from the July 28, 2011 confirmation order ("the Order") of the bankruptcy court in the above referenced bankruptcy case. This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 80 (3d Cir. 1999). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101-02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. *In re Hechinger,* 298 F.3d 219, 224 (3d Cir. 2002); *In re Telegroup,* 281 F.3d 133, 136 (3d Cir. 2002).

## II. PROCEDURAL BACKGROUND

On October 18, 2009, the Catholic Diocese of Wilmington, Inc. ("the Diocese") filed a petition in the United States Bankruptcy Court for the District of Delaware for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532. On November 19, 2009, the Diocese sought court approval for an "order authorizing it

(1) to continue providing pensions, sustenance and/or medical coverage in the ordinary course to certain retired or removed priests accused of sexual abuse; and (2) to use certain restricted funds to pay prepetition priest pension obligations" ("the sustenance motion"). (D.I. 3, ex. 4) The sustenance motion was opposed by the Official Committee of Unsecured Creditors ("Official Committee"); the "Unofficial Committee of State Court Abuse Survivors" ("Ad Hoc Committee") joined in the opposition. (*Id.*, exs. 6, 7) After protracted litigation, the sustenance motion was dismissed by order signed February 19, 2010. (*Id.*, exs. 20-31) Appellant Kenneth Martin ("appellant") filed a proof of claim in the Diocese' chapter 11 case on April 14, 2010. (D.I. 13, ex. 2)

The Diocese filed a second amended plan of reorganization on May 23, 2011. (D.I. 3, ex. 32) In said plan, the clergy pension plans were unimpaired, and the Diocese sought permission for the reorganized debtor to manage its property and its affairs without further order of the bankruptcy court. (D.I. 2, ex. 11 at 123) The Ad Hoc Committee filed its opposition to said plan on June 30, 2011, citing three objections: (1) to the timing of payment and distribution to survivors; (2) to payment of professionals for the Ad Hoc Committee from the settlement trust rather than by the Diocese; and (3) to excluding counsel for the Ad Hoc Committee from the protection of the indemnification provision. (D.I. 3, ex. 41) By "comment," also filed on June 30, 2011, the Official Committee expressed that it was "deeply offended by the Plan's treatment of the Clergy Pension Claims or Other Unsecured Claims asserted by anyone who is responsible for Abuse." (*Id.*, ex. 42)

At the July 8, 2011 confirmation hearing, the Diocese called Bishop Malooly as a witness in support of its plan of reorganization. Bishop Malooly was cross-examined on

2

the issue of clergy pension claims, and testified that he had no intention of giving
money or benefits in the ordinary course to certain individuals named by counsel for the
Ad Hoc Committee. (*Id.*, ex. 44 at 61- 76, 110-112) Following the hearing and at the
request of the bankruptcy court, the Diocese submitted a letter brief that addressed the
canonical obligation of a Roman Catholic diocesan bishop to provide sustenance or
charity to clergy. (*Id.*, ex. 45) Counsel for the Ad Hoc Committee filed an objection to
said letter on the grounds that it contained expert testimony. (*Id.*, ex. 46)

In anticipation of the continued confirmation hearing, the Ad Hoc Committee filed
a bench memo on July 13, 2011 in opposition to what it labeled the "renewed"
sustenance motion. (D.I. 2, ex. 5) In its submission, the Ad Hoc Committee sought
affirmative relief by urging the bankruptcy court to issue an injunction (hereafter, "the
Injunction") in one of the two following alternate forms:

> The Reorganized Debtor, the Bishop, and the Non-Debtor Catholic
> Entities under the Plan, and their successors and assigns, officers,
> agents, servants, employees and attorneys are forever barred and
> permanently enjoined from providing any money, salary, wages,
> employment benefits, pension, medical benefits, housing benefits,
> medical insurance, other financial benefits of any kind whatever,
> sustenance or charity to Francis G. DeLuca, Douglas W. Dempster,
> Edward F. Dudzinski, Kenneth J. Martin, Joseph A. McGovern, Francis J.
> Rogers, John A. Sarro, Charles W. Wiggins, or Harry P. Weaver.

********************

> The Reorganized Debtor, the Bishop, and the Non-Debtor Catholic
> Entities under the Plan, and their successors and assigns, officers,
> agents, servants, employees and attorneys are forever barred and
> permanently enjoined from providing any money, salary, wages,
> employment benefits, pension, medical benefits, housing benefits,
> medical insurance, other financial benefits of any kind whatsoever,
> sustenance or charity to Francis G. DeLuca, Douglas W. Dempster,
> Edward F. Dudzinski, Kenneth J. Martin, Joseph A. McGovern, Francis

3

> J. Rogers, John A. Sarro, Charles W. Wiggins or Harry P. Weaver
> without first notifying the Court in writing of its consideration of such action,
> then filing a Motion seeking such relief, notifying all parties with interest in
> such a proceeding, including current state court counsel for any survivor or
> childhood sexual abuse, and seeking an order of the Court approving such
> action after notice and an opportunity to be heard by state court counsel
> and their clients.

(*Id.*, ex. 5 at 7-8)

The bankruptcy court entertained argument on the above request the following day. Despite the fact that the record had been closed and no notice had been given to opposing counsel, the Ad Hoc Committee asked the bankruptcy court to admit as an exhibit an undated letter[1] authored by deceased Bishop Saltarelli ("the Saltarelli letter") and captioned "Update on sexual abuse of minor by priests." The Saltarelli letter reads in pertinent part as follows:

> I have decided to disclose the names of 18 of the 20 priests of our
> diocese, both living and deceased, about whom we have received
> admitted, corroborated or otherwise substantiated allegations of
> sexual abuse of minors. . . . By disclosing the names and locations
> of those living priests about whom we have received admitted,
> corroborated or otherwise substantiated allegations of sexual abuse,
> we perhaps in some way may help prevent or deter any further
> incidents.

(*Id.*, ex. 1) The name of appellant was included among the 18 priests so identified. The bankruptcy court admitted the letter over the objections of appellant. It is not altogether clear the basis upon which the document was admitted. (*See id.*, ex. 11 at 168-172)

Appellant objected to the bankruptcy court's considering the Ad Hoc Committee's

---

[1] Referred to in oral argument as "Bishop Saltarelli's 2006 letter." (*Id.*, ex. 11 at 167).

4

request for injunctive relief. In this regard, appellant raised due process concerns, arguing that he was "entitled to notice and an opportunity to be heard before his opportunity to receive sustenance under any circumstance should be denied by this or any other court." (*Id.*, ex. 11 at 137) Without addressing appellant's due process concerns, the bankruptcy court ruled from the bench as follows (in pertinent part):

> I have in front of me a civil entity, which is the Catholic Diocese of Wilmington, a corporation that is in bankruptcy and is seeking a discharge of its liabilities and confirmation of a plan that treats different types of creditors in different ways. . . .
>
> One of the requirements that the debtor has to make and approve to get confirmed is that the debtor is operating in good faith; that's under 1129(a)(3). And I have [an] independent duty as the judge to make the findings under 1129 in order to confirm a plan. And again, 1129(a)(3) is that the plan [is] proposed in good faith.
>
> This plan impairs, albeit consensually, abuse survivors and it doesn't impair among others the abuser priests. It goes on to reserve the right as provided for in the Code to use its post-reorganization property as it sees fit. Under the unique circumstances [of] this case, however, I find that doing so, reserving the right to make payments to the abuser priests while impairing claims of abuse survivors, in asking for that, the debtor is not proposing a plan in good faith and I cannot make an 1129(a)(3) finding that allows that.
>
> The language proposed by [counsel for the Ad Hoc Committee], I think with some tweaking, would solve the issue for the debtor but I'm not here to - - negotiate. My concern is that a plan that allows the debtor going forward to use property belonging to the reorganized debtor or the nondebtor Catholic entities to make any financial payment whatsoever to any of these abuser priests. I'm not going to confirm a plan unless there is some sort of prohibition on that because I don't think the debtor would be operating in good faith. And that's my ruling on that point.

(*Id.*, ex. 11 at 177)

There followed a period of time when plan modifications were circulated. On July 27, 2011, the bankruptcy court conducted a status conference on the continued

5

confirmation hearing, wherein counsel for the Diocese and counsel for the Ad Hoc Committee "proposed to the court competing forms of language in order to effectuate [the Injunction] ruling of the court during the July 14, 2011 session of the confirmation hearing." (*Id.*, ex. 8) The Diocese published a notice that same day declaring that on July 28, 2011, the court "will consider including the competing forms of language [regarding the Injunction] . . . in the order confirming" the second amended plan of reorganization. (*Id.* ex. 8) Appellant filed an objection to the second amended plan, also on July 27, 2011. (*Id.*, exs. 6, 7)

On July 28, 2011, when the confirmation hearing resumed, the issue of the Injunction was addressed. Appellant once again objected to the proposed plan language regarding the Injunction. More specifically, appellant argued that "the phrase 'abuser priest' should recognize the concept of the nexus that [the bankruptcy court was] concerned about," and suggested in this regard that, rather than using the list of names found in the Saltarelli letter, the bankruptcy court focus instead on the survivor claims; i.e., that the plan define "abuser priests" in connection with the survivor claims. (*Id.*, ex. 12 at 20-21) In response, counsel for the Diocese argued that such a procedure would violate Rule 65[2] as not describing in sufficient detail who is covered by the Injunction. (*Id.*, ex. 12 at 31) The bankruptcy court endorsed use of the "list of those [eight] names . . . as the enjoined parties." (*Id.*, ex. 12 at 34)

With respect to the propriety of the Injunction, the bankruptcy court found the entry of a permanent injunction to be "quite appropriate." (*Id.*, ex. 12 at 45) More

---

[2]This is the first and only mention by anyone of Fed. R. Civ. P. 65 and its requirements for entry of injunctive relief.

6

specifically, the bankruptcy court found that there

> is no right to ongoing pension. This is not an ERISA pension, this is a state law pension and, under state law, terminable at will. . . . I think it's appropriate to carve individuals out in this instance based on a pres -- well, not presumption, but based on an allegation that I think has a lot of weight of evidence behind it. . . . [A]s there is no legal right to any payment - and in fact . . ., it could be the debtor's choice to terminate the pensions in connection with this. I'm going to make them do it and I'm going to enter an injunction because I think it's the right thing to do, and I think it's [the] only way the debtor can be operating in good faith. And again, under 1129 I need to make that good faith finding. So I'm going to overrule the objections and I will approve provisions that are consistent with this concept.

(*Id.,* ex. 12 at 47)

On July 28, 2011, the bankruptcy court entered its "Findings of Fact, Conclusions of Law, and Order Confirming the Second Amended Chapter 11 Plan of Reorganization of Catholic Diocese of Wilmington, Inc.," which provided in pertinent part as follows:

> 55. <u>Modification of Clergy Pension Plan.</u> The Debtor shall modify the Clergy Pension Plan to provide that Francis G. DeLuca, Douglas W. Dempster, Edward F. Dudzinski, Kenneth J. Martin, Joseph A. McGovern, Francis J. Rogers, John A. Sarro, Harry P. Weaver, and Charles W. Wiggins (the "Removed Priests") shall be ineligible for benefits of any kind arising on or after the Petition Date. Such modification is hereby approved pursuant to § 363(b) of the Bankruptcy Code, effective as of the Confirmation Date.

> 56. <u>Objection to Certain Claims.</u> Within sixty (60) days after the Confirmation Date, the Debtor shall object to any and all Claims, in their entirety, of the Removed Priests asserted against the Debtor, regardless of whether such Claims are asserted as pre-petition, post-petition, or post-confirmation Claims (the "Removed Priest Claims"). The Plan shall be modified accordingly.

> 57. <u>Prohibition of Consideration to Certain Individuals.</u> Catholic Diocese of Wilmington, Inc. and each of the Non-Debtor Catholic Entities organized and existing as a civil, corporate and secular entity under the laws of a State, shall be the "Enjoined Civil Entities." The Enjoined Civil Entities shall be forever barred and permanently enjoined from providing any money, salary, wages, employment benefits, pensions,

7

medical benefits, housing benefits, medical insurance, sustenance, charity, or other financial benefits of any kind whatsoever, to the Removed Priests. This injunction shall further preclude the direct or indirect use of the assets of the Enjoined Civil Entities, whether by the Enjoined Civil Entities themselves or by their officers, agents, servants, employees, and attorneys, to provide any of the enumerated benefits to any of the persons listed. Notwithstanding the foregoing, this injunction shall not apply to the payment of any Allowed prepetition Removed Priest Claims (including any claims arising under the Clergy Pension Plan), *provided, however,* that no such payment may be made until the entry of a Final Order resolving the Debtor's objection to the Removed Priest Claims as required by paragraph 56 hereof. In addition, this injunction shall not apply to services provided by Catholic Charities, Inc. in the ordinary course that are generally available to the public. For the avoidance of doubt, this injunction shall not be construed to prohibit the provision of any of the enumerated benefits to any of the persons listed by any individual, in his or her individual capacity, or by any individual who holds an ecclesiastical office (including the Bishop), in his capacity as ecclesiastical officer, provided that such benefits are provided using assets other than the assets of the Enjoined Civil Entities. The Plan shall be modified accordingly.

(D.I. 2, ex. 10 at 50-51) On August 8, 2011, the Diocese filed the "Conformed Second Amended Chapter 11 Plan of Reorganization" that "contained changes requested by parties in interest and/or the Bankruptcy Court in connection with the July 8, July 14 and July 28, 2011 hearings regarding confirmation of the Plan," consistent with the Order. (D.I. 3, exs. 47, 48)

Appellant timely appealed, asserting that the bankruptcy court committed error by admitting into evidence the Saltarelli letter, ordering modification of the clergy pension plan, classifying all of the claims of the "Removed Priests"[3] in a separate

---

[3]The phrase "Removed Priests" is defined in section 18.20 of the second amended plan of reorganization: "The Debtor shall modify the Clergy Pension Plan to provide that Francis G. DeLuca, Douglas W. Dempster, Edward F. Dudzinski, Kenneth J. Martin, Joseph A. McGovern, Francis J. Rogers, John A. Sarro, Harry P. Weaver, and Charles W. Wiggins (the 'Removed Priests') shall be ineligible for benefits of any kind arising on or after the Petition Date." (D.I. 3, ex. at 51 and A-17; *see also* D.I. 2, ex. 10 at 50-51, ¶¶ 55, 57)

8

classification, including appellant in said class, and issuing injunctive relief pertaining to appellant as provided in paragraph 57 of the Order.[4] The Diocese responds by arguing that appellant is not a "person aggrieved" by the Order and, thus, has no standing to appeal. Even if appellant were to have standing, the Diocese argues that any legal error committed was harmless and should not mandate reversal.[5]

## III. ANALYSIS

### A. Standing

"Standing to appeal in a bankruptcy case is limited to 'persons aggrieved' by an order of the bankruptcy court." *In re Combustion Eng'g Inc.*, 391 F.3d 190, 214 (3d Cir. 2004). "[O]ne is a 'person aggrieved' if the contested order 'diminishes their property, increases their burdens, or impairs their rights.'" *Travelers Ins. Co. v. H.K. Porter Co.*, 45 F.3d 737, 742 (3d Cir. 1995) (*citing In re Dykes*, 10 F.3d 184, 187 (3d Cir. 1993)). As explained by the Ninth Circuit in *In re Fondiller*, 707 F.2d 441, 443 (9th Cir. 1983), and cited with approval by the Third Circuit in *H.K. Porter,* the "person aggrieved" doctrine

> exists to fill the need for an explicit limitation on standing to appeal in bankruptcy proceedings. This need springs from the nature of bankruptcy litigation which almost always involves the interests of persons who are not formally parties to the litigation. In the course of administration of the bankruptcy estate, disputes arise in which

---

[4]Appellant did not reply to the Diocese's responsive arguments regarding classification of the "Removed Priests" claims. (D.I. 12 at 26-27) The court does not address these arguments further.

[5]Interestingly, the Diocese concedes that the "Removed Priest Provisions are unusual. And they were the product of a confirmation proceeding with a lot of moving parts, where legal error may have been committed. However, the purpose of an appeal is not to seek out and correct legal error for its own sake." (D.I. 12 at 11)

9

> numerous persons are to some degree interested. Efficient judicial administration requires that appellate review be limited to those persons whose interests are directly affected.

*H.K. Porter*, 45 F.3d at 741 (*citing In re Fondiller*, 707 F.2d at 443). In *H.K. Porter*, the Third Circuit held that Travelers Insurance Company was not a "person aggrieved" where its property had not been diminished by the reinstatement of certain creditors' claims against the debtor.

In arguing that appellant is not a "person aggrieved," the Diocese argues that appellant "lost nothing on July 28, 2011 [the date the confirmation order was signed] that he possessed on July 27, 2011." (D.I. 12 at 12) More specifically, the Diocese argues that appellant "was already ineligible for benefits under the Clergy Pension Plan" on July 27, 2011, citing to the July 8, 2011 hearing where Bishop Malooly stated that he intended to amend the plan "to exclude anyone who has been accused of child abuse and that has been substantiated." (D.I. 3, ex. 44 at 55) The Diocese further argues that, although the confirmation order required it to object to appellant's claim, "on July 27, the [Diocese] already intended to object to" said claim, citing its omnibus reply to the various objections to confirmation of the plan. (*Id.*, ex. 43 at C3) The Diocese contends that, because appellant was not receiving any other consideration from the Diocese and the Diocese "had no intention to providing any," the confirmation order did not result in any direct pecuniary harm to appellant.

Even accepting as true the representations of the Diocese that the confirmation order did not strip away any benefits to which appellant was presently entitled,[6] the

---

[6] Appellant disputes this fact, and the Diocese is relying only on a future "intention" of the Bishop to buttress its position.

10

court concludes that the Order did increase appellant's burdens and/or impair his rights. Unlike the insurance company in the *H.K. Porter* case, which was left to litigate its prospective rights in the ordinary course of business,[7] the bankruptcy court, through the Injunction, essentially terminated any civil rights appellant had to seek any such benefits post-petition.[8] In this regard, therefore, Third Circuit precedent is distinguishable.

The Diocese further argues that the Injunction was a consensual provision entered into by the parties to the chapter 11 plan[9] and that, while appellant is the subject **of** the Injunction, he is not subject **to** the Injunction and, therefore, has no standing to appeal its entry. (D.I. 12 at 18) The court disagrees. There can be no dispute that appellant is the subject of an injunction that, by forever barring and permanently enjoining the Diocese and other non-debtor entities from providing appellant any consideration whatsoever, forecloses appellant's rights to pursue any civil

---

[7]The Third Circuit's having found that the insurer's interest in the bankruptcy proceeding was too contingent to have been directly affected by the order reinstating the claims against the debtor.

[8]The court recognizes that, although paragraph 56 of the Order requires the Diocese to object to appellant's bankruptcy claims, such claims would be adjudicated through the normal course and, therefore, do not raise the same concerns as the Injunction. Indeed, the bankruptcy court found it to be "important to preserve those due process rights for the pre-petition claims that have been filed . . . . Certainly all defenses or points in any kind of contested claim objection process are fully preserved, and we'll have to deal with that at the appropriate time." (D.I. 2, ex. 12 at 46)

[9]Although the Diocese cites *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004), for the proposition that "[a] chapter 11 plan is a contract, and parties to that contract are free to agree to an injunction limiting their freedom of action" (D.I. 12 at 18), the bankruptcy court in that case simply held that "a Plan is a contract that may bind those who vote in favor of it."

11

remedies long after the bankruptcy case is closed (again, unlike the insurance company in *H.K. Porter*). (*See* D.I.12 at 19, 22) Rather than acknowledge that this far-reaching Injunction impairs appellant's prospective rights to pursue civil remedies outside the bankruptcy context, the Diocese instead argues that appellant should also be deprived of the opportunity to challenge the propriety of such an Injunction through this appeal, because the Injunction was a creature of contract to which appellant was not a party. In so doing, the Diocese ignores both its acknowledgment (when it advised appellant that an injunction was going to be sought that "may prejudice your legal rights") and that of the bankruptcy court (describing the category of removed priests as "the enjoined parties") that appellant's legal rights were going to be impaired by the entry of the proposed Injunction. (*See* D.I. 2, ex. 8 and ex. 12 at 34)

In sum, the court rejects the notion that a party who was fully engaged in the bankruptcy proceedings somehow loses standing to appeal the resulting decisions simply because, in this instance, he did not prevail and the Injunction was "consensually" entered at the bankruptcy court's insistence. The court, therefore, finds that appellant has standing to appeal the entry of the July 28, 2011 confirmation order.

**B. Injunction**

As the court understands the essence of the appeal at bar, appellant objects, as he did consistently throughout the confirmation process, to the entry of the Injunction and to his being included among the subjects of the Injunction. The record demonstrates in this regard that the only reason appellant was included among the subjects of the Injunction was because the bankruptcy court required the Diocese to use "a specific list" of those "eight names" as the "enjoined parties," consistent with the

12

list of names taken from the Saltarelli letter. (D.I. 2, ex. 12 at 34)

Nonetheless, the Diocese insists that the admission of the Saltarelli letter "could [only] constitute reversible error . . . if [appellant's] inclusion in the Removed Priest Provisions implicitly depended upon his status as an **actual** abuser." (D.I. 12 at 25) (emphasis in original) According to the Diocese, because the Order "makes no findings whatsoever with respect to" appellant and the only relevance of the "Removed Priest Provisions" was to "remedy" the bankruptcy court's bad faith finding, the Saltarelli letter was admitted for the sole purpose of demonstrating the state of mind of the Diocese, pursuant to Fed. R. Evid. 803(3), and was harmless error. (*Id.*)

There can be no dispute, however, that the Order imposed a permanent injunction that directly affected a category of individuals ("Removed Priests"); the category of "Removed Priests" was embraced by the bankruptcy court based solely upon the Saltarelli letter. The Saltarelli letter is not a legal document; there is no indication that it was intended to confer or eliminate legal rights. It was written by then Bishop Saltarelli (now deceased) who represented in a conclusory fashion that he had "admitted, corroborated or otherwise substantiated allegations of sexual abuse of minors" concerning the priests named therein. (D.I. 2, ex. 1 at 1; ex. 12 at 34, 45) Appellant was included in the list and, therefore, subject to the provisions of the Order. The court is hard pressed to understand how the Diocese can argue, in good faith, that the Order does not have very real consequences for appellant based on the truth of the allegations contained in the Saltarelli letter, that is, that appellant and the others identified therein should be deprived prospectively not only of all civil benefits provided by the Diocese and other non-debtor entities, but also of all redress for said deprivation,

13

based on their status as alleged abusers. Admission of the Saltarelli document under these circumstances was legal error.[10]

As described above, the keystone of the Injunction is the list of "Removed Priests" taken from the Saltarelli letter; the Injunction would be meaningless at best, over-broad at worst, if there were no defined target of the injunctive relief. The question becomes whether the Injunction survives if the Saltarelli letter was improperly admitted. In this regard, bankruptcy courts enjoy broad authority to issue injunctions under § 105 of chapter 11 of the United States Code, which provides that bankruptcy courts "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "By its very terms, § 105(a) authorizes only court orders that are necessary to carry out the provisions of the [Bankruptcy] Code." *In re Richard Potasky Jeweler, Inc.*, 222 B.R. 816, 825 (S.D. Ohio 1998). *See also Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988).

In this case, the bankruptcy court tethered the grant of a permanent injunction to the good faith requirement found in § 1129(a)(3), to wit, the Diocese was required to include the Injunction in its plan of reorganization in order to demonstrate that it was operating in good faith. The court has found no cases with similar facts, that is, any cases that impose a permanent, prospective injunction on non-debtors that has no

---

[10]To the extent the Saltarelli letter was admitted as an exception to the rule against hearsay, the record lacks sufficient indicia of trustworthiness as to the matters asserted therein. *See, e.g.,* Fed. R. Evid. 803(6)(E); Fed. R. Evid. 804(3)(B); Fed. R. Evid. 807(a)(1). To the extent that the Saltarelli letter was admitted as "an opposing party's statement," the real opposing party in these proceedings has not been the Diocese but appellant; clearly the Saltarelli letter does not represent an admission by appellant.

14

impact whatsoever on the estate of the debtor. For instance, the court in *In re Richard Potasky Jeweler, Inc.*, 222 B.R. at 826, explained that "any permanent injunction granted pursuant to § 105(a) must have a direct and immediate connection to the property contained in or the administration of the debtor's plan of reorganization in order to be proper." Likewise, in *In re Labrum & Doak, LLP,* 237 B.R. 275 (Bankr. E.D. Pa. 1999), the bankruptcy court approved the imposition of an injunction to prevent further actions by creditors of a debtor against the partners of said debtor (non-debtor third parties). The bankruptcy court held that § 105(a) could be a basis for extending relief to non-debtors "**if and only if**" the moving parties satisfied the following four requirements:

> [1] that there be the danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize . . .[; 2] . . . there must be a reasonable likelihood of reorganization[; 3] the court must balance the relative harm as between the debtor and the creditor who would be restrained[; and 4] the court must consider the public interest; this requires a balancing of the public interest in successful bankruptcy reorganizations with other competing social interests.

*Id.* at 306 (emphasis added) (*quoting In re Monroe Well Service, Inc.*, 67 B.R. 746, 752-53 (Bankr. E.D. Pa. 1986). The bankruptcy court in *In re Labrum & Doak* then went on to review the four *Monroe Well* requirements, finding that the settlement with the third party partners was an "essential source of funding" and that failure to impose the injunction would likely result in a "multiplicity of actions by creditors and by and between settling and non-settling partners," thus resulting in a "disorderly and inequitable distribution of assets to creditors, contrary to the contemplation of the Bankruptcy Code." *In re Labrum & Doak*, 237 B.R. at 306. With respect to the requirements that

15

the bankruptcy court balance the harms between the parties, the court concluded that, if the injunction were not granted, "the prospects for the continuing implementation and funding of the Plan are significantly adversely affected, which in turn adversely and significantly affects the Debtor, and the settling Defendants, and ultimately the creditors as well." *Id.* at 307. As to the public interest, the bankruptcy court found that, "[b]y protecting the assets of the partners from contribution and other suits, the injunction at issue conserves the assets of the partnership available under state law to satisfy partnership debts." *Id.* The bankruptcy court concluded, based on the evidence presented, that the Administrator "established each element of the four requirements enunciated . . . in *Monroe Well Service*." *Id.* at 308.

In this case, the bankruptcy court imposed a permanent injunction on third parties without referring to any evidentiary requirements like those identified above, and without requiring the Diocese (or the Official Committee or the Ad Hoc Committee) to bear any burden of proof in that regard. Moreover, the record demonstrates that the imposition of the Injunction will have no impact on the property of the estate, as the Diocese has represented, through its agent under oath, that it has no intention of providing any prospective benefits to appellant or other similarly situated individuals. The Diocese has successfully reorganized and, in so doing, has demonstrated its good faith by vigorously defending the entry of the Injunction on appeal. In sum, there is no danger of any harm, let alone imminent, irreparable harm, to the estate or the debtor's ability to reorganize. In balancing the harms, then, the balance tips toward appellant, who has been stripped of any civil redress.

In weighing the public interest, the court does not question the motivations

16

behind the imposition of the Injunction. However, good intentions cannot trump the rule of law and the fundamental requirement that there be a nexus established between the wrongs alleged and the remedy imposed. No such nexus exists of record, as there is no indication at bar that appellant was the subject of any of the survivor claims actually at issue in the Diocese's chapter 11 proceedings, and appellant was not given the opportunity to contest his inclusion as a subject of the Injunction.

## IV. CONCLUSION

The record demonstrates that the bankruptcy court exceeded the scope of its equitable powers under § 105(a) when it imposed a permanent injunction against third parties without addressing any of the requirements identified in the case law. In the absence of any such procedural safeguards, the entry of the Injunction is reversible error.[11]

Rule 8013 of the Bankruptcy Rules provides in relevant part that, "[o]n an appeal, the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Because the error made was one of law and not of fact,[12] and because it is evident from the record that the imposition of the Injunction never had an impact on the estate of the Diocese and no longer has any relevance to the Diocese's ability to reorganize,[13] the July 28, 2011

---

[11] Given this conclusion, the court does not address appellant's arguments based on the Free Exercise Clause of the First Amendment.

[12] And, therefore, reviewed *de novo*.

[13] The Diocese having shown its good faith via the sworn, live testimony of Bishop Malooly and its substantial efforts to defend the entry of the Injunction on appeal.

17

confirmation order is modified to excise paragraph 57.

An appropriate order shall issue.